1

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7                  FOR THE NORTHERN DISTRICT OF CALIFORNIA

8

9

10   SAVE STRAWBERRY CANYON,                      No. C 11-01564 WHA

11                  Plaintiff,

12         v.                                     **ORDER ON CROSS MOTIONS
                                                  FOR SUMMARY JUDGMENT,
13   U.S. DEPARTMENT OF ENERGY, *et al.*,         MOTION TO AUGMENT THE
                                                  RECORD, REQUESTS FOR
14                  Defendants.                   JUDICIAL NOTICE, AND
                                                  MOTION TO STRIKE**
15   _____/

16                              **INTRODUCTION**

17         In this NEPA action, the parties bring cross-motions for summary judgment.  Plaintiff

18   moves to augment the record and makes three requests for judicial notice.  Defendants move to

19   strike plaintiff's opposition to defendants' motion for summary judgment and reply in support of

20   plaintiff's motion for summary judgment.  This order follows full briefing and oral argument.  For

21   the reasons stated below, the defendants' motion for summary judgment is **GRANTED**.  Plaintiff's

22   motion for summary judgment is **DENIED**.  Plaintiff's motion to augment the record is **DENIED**.

23   Plaintiff's requests for judicial notice are **GRANTED**, to the extent stated below.  Defendants'

24   motion to strike is **DENIED AS MOOT**.

25                               **STATEMENT**

26         This action arises from the proposed construction of the Computational Research and

27   Theory Facility Project ("CRT project").  In an earlier action, this Court held that a federal NEPA

28   review was required, even though the University of California was the developer, because of the

     role of the United States Department of Energy in the project.  That federal agency has now done

**United States District Court**
For the Northern District of California

the NEPA review and the pending question in this new action is whether the federal review was sufficient.  The Department of Energy found that the CRT project will not have a significant impact on the quality of the human environment and does not require an environmental impact statement ("EIS") pursuant to the National Environmental Policy Act.

DOE's stated purpose for the proposed action is "to support DOE [Office of Sciences'] mission in Computational Research and Theory by operating the [National Energy Research Scientific Computing Center ('NERSC')] as the premier computing user facility for the research community, and by conducting programmatic and applied research and development in computational science, computer science, and applied mathematics" (AR 29).  Under the proposed CRT project, NERSC would be relocated to the new CRT facility.  A description and history of the project follows.

**1.      THE CRT PROJECT.**

The proposed CRT project comprises the following:  (1) Construction of a new "three-story facility and associated infrastructure that would be constructed at the Lawrence Berkeley National Laboratory ("LBNL") site by the University of California" on University-owned land. The facility would become the new home to various LBNL and NERSC programs and computations equipment; (2) Relocation of DOE's NERSC, which includes two supercomputing systems, data storage systems, and staff from Oakland to the proposed CRT facility; and (3) Relocation of LBNL's Computational Research Division and the joint UC Berkeley/LBNL Computational Science and Engineering programs to the proposed CRT facility (AR 28–30).

The proposed 2.25 acre site for the CRT facility is located in the "western portion of the LBNL site, in the eastern hills of the cities of Berkeley and Oakland in Alameda County, California" (AR 30).  It is approximately 122 meters (400 feet) east of the eastern trace of the Hayward fault (AR 73).  The proposed site is flanked on three sides by buildings (AR 30).  The sloped terrain of the site is vegetated with "75 eucalyptus and a few oak and bay trees" (*ibid*.). The proposed facility is designed to be "green" and meet Leadership in Energy and Environmental Design ("LEED") gold standards (AR 144).  The facility would consist of (AR 30):

1

2

3

4

> approximately 3,000-square-meter (32,000 gross square feet [gsf]) [high-performance computing] floor with a high ceiling and two additional floors of office space for a total of approximately 12,980 square meters (139,700 gsf). The computer floor would consist of two 10,000-square-foot (sf) column-free spaces flanking a central 12,000-sf space with no more than four columns.

5   Approximately 300 staff from LBNL programs would be relocated to the new facility (AR 29).

6   At full implementation, the facility would require five 20-foot high cooling towers for cooling the

7   supercomputers, located near the exterior southeast side of the high-performance computing

8   portion of the facility (AR 50).

9       **2.      HISTORY OF THE CRT PROJECT.**

10          In 2007, the University of California adopted what it refers to as a Long Range

11   Development Plan ("LRDP").  The University determined that the CRT project was part of the

12   growth projected under the LRDP, and, in compliance with the California Environmental Quality

13   Act ("CEQA"), the University evaluated the CRT project for its environmental impacts in an

14   environmental impact report ("EIR") (AR 33).  The University approved the CRT project (AR

15   33).  Plaintiff Save Strawberry Canyon filed an action in state court challenging the University's

16   environmental review of the CRT project under CEQA.  Plaintiff abandoned that effort and

17   requested dismissal of that action.  It was dismissed on December 1, 2008 (Whitfield Exh. 1).

18          Plaintiff Save Strawberry Canyon then filed a federal complaint seeking declaratory relief,

19   specifically, it sought a declaration that the project was a major federal action governed by

20   NEPA.  Plaintiff also sought injunctive relief to halt the project until defendants completed an

21   environmental impact review.  At that time, Save Strawberry Canyon earned a reprieve when the

22   undersigned judge held that a federal agency was behind the planned construction project, and,

23   therefore, the federal agency had to carry out the NEPA process.  That agency — the United

24   States Department of Energy — has now done so.  This has been in addition to the full California

25   environmental CEQA review undertaken on behalf of the University of California in whose name

26   the project was initiated.

27          Pursuant to this Court's decision in *Save Strawberry Canyon v. DOE*, 613 F. Supp. 2d

28   1177 (N.D. Cal. 2009), DOE undertook a NEPA review and conducted an environmental

*United States District Court*
For the Northern District of California

3

United States District Court

For the Northern District of California

assessment of the CRT project. DOE conducted a study of 14 environmental impacts:
(1) geology and soils; (2) water resources; (3) hazards, human health, and accidents; (4)
biological resources; (5) cultural resources; (6) visual resources; (7) air quality; (8) greenhouse
gases; (9) noise; (10) transportation and traffic; (11) utilities and waste management; (12) public
services; (13) population and housing, socioeconomics, and environmental justice; and (14)
construction traffic accidents (AR 18, 69–111). (As to this list, plaintiff challenges DOE's
analysis and conclusions as to noise, traffic, and GHG emissions.) DOE provided opportunities
for public comment and input. DOE evaluated five other alternatives, including a no-action
alternative (AR 31–32). As part of its study, DOE engaged and relied upon expert consultants to
perform studies related to noise, traffic, and GHG emission impacts, and LBNL's geotechnical
expertise.

On September 15, 2010, DOE released a draft environmental assessment ("EA") for a
30-day public comment period (AR 1585, 1591). Plaintiff, two public agencies, six different
organizations, and twelve individuals provided comments on the draft EA (AR 326–27, 754–62,
759, 768–1506, 1570–78, 1582, 1584). DOE held a public information meeting to discuss the
project on September 20, 2010 (AR 1585, 1587). DOE addressed comments received on the draft
EA (AR 323–90). On February 25, 2011, DOE issued a finding of no significant impact
("FONSI"), concluding that the anticipated impacts of the CRT project would not have a
significant environmental impact (AR 6–13). DOE released a final EA deciding not to prepare an
EIS for the CRT project.

*          *          *

This follow-on action was filed on March 31, 2011, challenging DOE's finding of no
significant impact and use of an EA rather than an EIS. The complaint alleges two claims for
violations of NEPA and the Administrative Procedure Act. Plaintiff seeks a declaratory judgment
and injunctive relief preventing defendants from funding the CRT project or initiating any
activities in furtherance of it that could change or alter the physical environment unless
defendants prepare an EIS in compliance with NEPA.

United States District Court

For the Northern District of California

1    The question is whether the DOE environmental review has been in compliance with

2    NEPA and the APA.  DOE performed an environmental assessment and found that the project

3    would have no significant environmental impact.  Based on this finding, DOE did not undertake a

4    full-scale EIS.

5    We must always remember that NEPA is a procedural — not a substantive — statute.

6    Once the agency takes a hard look at the environmental consequences of the proposed action, the

7    agency is free to destroy the environment.  NEPA does not require, in making the substantive

8    decision, that any extra weight be given to environmental preservation, sad as that sometimes is.

9    The administrative record was lodged in May 2011, and supplemented in June 2011 (Dkt.

10   Nos. 12, 30).  It contains over sixteen thousand pages of documents.  After the administrative

11   record was completed, cross-motions for summary judgment were filed and fully briefed.

12   Plaintiff filed a motion to augment the record and a request for judicial notice.  Plaintiff filed two

13   additional requests for judicial notice.  Defendants filed a motion to strike.  This order follows a

14   hearing on the motions.

**ANALYSIS**

16   NEPA has no specific judicial review provision.  NEPA actions are, instead, reviewable

17   under the APA.  *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 882–83 (1990).  Under the APA,

18   judicial review of administrative agency decisions is based on the administrative record compiled

19   by the agency — not on independent fact-finding by the district court.  *Camp v. Pitts*, 411 U.S.

20   138, 142 (1973).  Summary judgment must be granted when "there is no genuine dispute as to any

21   material fact and the movant is entitled to judgment as a matter of law."  FRCP 56(a).  Courts

22   may resolve APA challenges via summary judgment.  *See Nw. Motorcycle Ass'n v. United States*

23   *Dep't Agric.*, 18 F.3d 1468, 1472 (9th Cir. 1994).

24   The APA "requires that plaintiffs exhaust available administrative remedies before

25   bringing their grievances to federal court."  *Idaho Sporting Cong., Inc. v. Rittenhouse*, 305 F.3d

26   957, 965 (9th Cir. 2002).  Under the APA, a reviewing court shall set aside agency action,

27   findings, or conclusions found to be "arbitrary, capricious, an abuse of discretion, or otherwise

28   not in accordance with law" or "without observance of procedure required by law."  5 U.S.C.

706(2).  In its review of an agency decision, a court "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 378 (1989).  If the evidence before the agency "provided a rational and ample basis" for its decision, the decision will be upheld under the arbitrary-and-capricious standard.  *Systech Envtl. Corp. v. United States Envtl. Prot. Agency*, 55 F.3d 1466, 1469 (9th Cir. 1995).

The reviewing court's role is not to pass judgment on the technical merits of the material. *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  But the reviewing court must conduct a "searching and careful" inquiry into the facts.  *Marsh*, 490 U.S. at 378.

**1.    EXHAUSTION.**

A NEPA plaintiff must exhaust administrative remedies before seeking judicial review of the administrative process.  The purpose of the exhaustion doctrine is to allow administrative agencies to utilize their expertise, correct any mistakes, and avoid unnecessary judicial intervention.  *Buckingham v. Sec'y of the United States Dep't of Agric.*, 603 F.3d 1073, 1080 (9th Cir. 2010).  A party waives the right to raise an argument during judicial review that was not raised during the administrative process.  *Lands Council v. McNair*, 629 F.3d 1070, 1076 (9th Cir. 2010).

Defendants argue that plaintiff waived the right to raise four issues by failing to raise them during the administrative process.  Each issue is considered in turn.

**A.    Noise.**

In its motion for summary judgment, plaintiff challenges the EA's method of measuring the expected noise impact of the CRT project.  More specifically, plaintiff argues that noise readings from the traffic-facing side of the Nyingma Institute, which is adjacent to the proposed construction site, were improperly used in the EA to argue that there would not be a significant increase in noise due to construction.  In actuality, the greatest increase in noise would be on the *other* side of the Institute, near the meditation garden, as there would be no acoustical barrier between that side of the Institute and the construction site, plaintiff now submits (Pl. Br. 6).

6

Defendants now argue that because plaintiff failed to question the noise level calculations or anything related to the Institute during the administrative process, it waived the right to raise the issue during judicial review (Def. Opp. 7). Plaintiff argues that defendants had ample notice of the community's concerns regarding the increase in noise levels due to the CRT project (Pl. Opp. 3).

While any issue not raised during the administrative process is waived, a party "need not raise an issue using precise legal formulations, so long as enough clarity is provided that the decision maker understands the issue raised." *Lands Council*, 629 F.3d at 1076. Alerting the agency in general terms is sufficient if the agency has been given an opportunity to bring its expertise to resolve the claim. *Native Ecosystems Council v. Dombeck*, 304 F.3d 866, 899–900 (9th Cir. 2002). Furthermore, an EA's flaws may appear to be "so obvious that there is no need for a commentator to point them out specifically in order to preserve its ability to challenge a proposed action." *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 765 (2004). In order for the "so obvious" standard to apply, the agency must have independent knowledge of the issues that concern petitioners. *Barnes v. United States Dep't of Transp.*, 655 F.3d 1124, 1132 (9th Cir. 2011).

Plaintiff replies that defendants had independent knowledge of the noise impact concerns, highlighting several documents in the administrative record discussing noise concerns (Pl. Opp. 4–5). *First*, plaintiff notes a previous EIR regarding the CRT project concluding that construction noise would be "significant and unavoidable" (AR 7955). *Second*, in a letter commenting on the draft EA, plaintiff raised doubts concerning noise analysis, stating (AR 774):

> [T]he construction noise is surely not calculated in your traffic study. At 10 to 15 cubic yards per truck, 60,000 cubic yards, that is between 6,000 and 4,000 round trips. And 85 decibels of noise? All that bone-jarring compaction? All those nasty truck-in-reverse beeps? . . . These damaging impacts need to be disclosed and seriously analyzed.

Appended to and referenced in plaintiff's comment letter on the draft EA was plaintiff's comment letter on the CRT draft EIR requesting a "noise sampling at various radii from the project site so as to accurately estimate the range of noise impacts" (AR 798). *Third*, community

United States District Court

For the Northern District of California

1   response to the increase in noise was documented in the administrative record.  Members of the

2   Institute expressed concern over loss of "peaceful enjoyment" of "residences, a meditation

3   garden, and meditation rooms" (AR 1571).

4          Plaintiff raised only general concerns about noise in the administrative record, and did not

5   specifically criticize the manner in which noise was measured or calculated in the EA (Def. Reply

6   Br. 1–2).  Now, plaintiff zeroes in on more targeted specifics about construction noise.  The

7   undersigned judge sees merit in the defense's argument, especially since plaintiff's counsel could

8   have but did not assist plaintiff in between the two lawsuits.  The court of appeals, however, has

9   declined to require more than general objections during the administrative process to avoid

10  "unduly burden[ing] those who pursue administrative appeals unrepresented by counsel, who may

11  frame their claims in non-legal terms rather than precise legal formulations."  *Native Ecosystems*,

12  304 F.3d at 900.

13         Accordingly, this order must hold that plaintiff did not waive its right to assert the claim

14  that the EA did not adequately address noise impact.

15                    **B.      Traffic.**

16         Plaintiff also alleges in its summary judgment motion that the EA inadequately assessed

17  the impact of increased traffic caused by the CRT project (Pl. Br. 9).  Defendants argue that

18  plaintiff waived the right to raise this issue by failing to raise concerns about traffic impact

19  calculations during the administrative process (Def. Opp. 7).  Plaintiff argues that defendants

20  were aware of traffic concerns during the administrative process, as they were raised in a number

21  of comments, and that "the flaws in the EA's traffic analysis [were] obvious" (Pl. Opp. 7).

22         Plaintiff identifies documentation in the administrative record where it questioned the

23  increase in traffic in an already congested area, expressing concern that the cumulative effect on

24  traffic "cannot be mitigated" and that "[l]ess damaging alternatives must be analyzed" (AR 773).

25  Plaintiff also resubmitted its comment on the draft EIR, reminding the DOE of its concern that

26  "[v]ehicular traffic will expand, but number of roadways in this already developed area will not"

27  (AR 799).  In that same resubmitted comment, plaintiff argued that several intersections near the

28

1  project cite already had the worst possible traffic congestion rating, and noted that it "is bad

2  planning to intensify development in an area with limited access" (*ibid.*).

3       Again, defendants argue that plaintiff did not object to the method of traffic assessment

4  with sufficient specificity in the administrative record (Def. Reply Br. 2).  As stated, however,

5  general assertions are sufficient so long as the agency is able to understand the issue raised.

6  Issues surrounding traffic impact were raised in the administrative record.  Plaintiff thus did not

7  waive the right to raise the issue of traffic in a judicial proceeding.

8            **C.    Precedential Impact.**

9       In its summary judgment motion, plaintiff argues that the CRT project would set a

10  precedent for implementing the LRDP, which was never independently reviewed by DOE for

11  environmental impacts (Pl. Br. 13).  Defendants argue that plaintiff never identified a concern

12  over the precedential impacts of the CRT project in the administrative record (Def. Opp. 7).

13       Plaintiff did, however, express concern at the expanding development and precedential

14  impact of the CRT project and relodged the concerns it had on this issue since the inception of the

15  project.  Plaintiff argued that the "CRT Facility project is also significant because it represents the

16  first step in the next wave of the Lab's new construction," noting the "inevitability of expansion"

17  and the "enormous growth-inducing impacts from this development" (AR 779, 780).  Plaintiff

18  sufficiently expressed concern over the alleged precedential impact of the CRT project in the

19  administrative record, thus it did not waive the right to renew this claim in a judicial proceeding.

20            **D.    GHG Emissions.**

21       Defendants challenge plaintiff's right to claim deficiency of GHG emission analysis (Def.

22  Opp. 7).  Plaintiff admits that it did not raise the issue during the administrative process, but

23  argues that Bay Area Air Quality Management District ("BAAQMD") did.  Plaintiff references a

24  letter from BAAQMD in the administrative record.  This letter stated that the EA's determination

25  that there would be no potential significant impact due to GHG emissions from the project was

26  not based on BAAQMD thresholds, urged DOE to "commit to all possible steps to minimize

27  these impacts," and listed several options for reducing GHG emissions (AR 754).

28

**United States District Court**
For the Northern District of California

The court of appeals "will not invoke the waiver rule in [its] review of a notice-and-comment proceeding if an agency has had an opportunity to consider the issue." This is true even if the issue was "raised by someone other than the petitioning party." *Portland Gen. Elec. Co. v. Bonneville Power Admin.*, 501 F.3d 1009, 1024 (9th Cir. 2007).

Here, BAAQMD raised the issue of GHG emissions, and offered several solutions for how to minimize the problem. Defendants were thus put on notice of the issue, and plaintiff does not lose the right to raise the issue now. Because the order finds the above issues to have been properly exhausted, it now turns to the merits analysis.

2. **CLAIM FOR FAILURE TO ADEQUATELY EVALUATE IMPACTS IN THE EA (NEPA AND APA).**

NEPA requires that an EIS is prepared for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. 4332(C). An agency may prepare an EA to decide whether the environmental impact is significant enough to warrant preparation of an EIS. An EA is a "concise public document . . . [that] [b]riefly provide[s] sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact." 40 C.F.R. 1508.9. Where an agency decides it need not prepare an EIS, "it must supply a convincing statement of reasons to explain why a project's impacts are insignificant." *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir. 1998) (internal quotations omitted). In *Center for Biological Diversity v. National Highway Traffic Safety Administration*, 538 F.3d 1172, 1185–86 (9th Cir. 2008) (internal quotations and citations omitted), our court of appeals stated:

> Whether an action may significantly affect the environment requires consideration of context and intensity. Context delimits the scope of the agency's action, including the interests affected. Intensity refers to the severity of impact, which includes both beneficial and adverse impacts, the degree to which the proposed action affects public health or safety, the degree to which the effects on the quality of the human environment are likely to be highly controversial, the degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks, and whether the action is related to other actions with individually insignificant but cumulatively significant impacts.

An action may be "significant" if one of these factors is met. *Id.* at 1220. An agency "cannot avoid preparing an EIS by making conclusory assertions that an activity will have only an insignificant impact on the environment." *Ocean Advocates v. United States Army Corps of Eng'r*, 402 F.3d 846, 864 (9th Cir. 2005). If the reasons for a finding of no significant impact are arbitrary and capricious and the complete administrative record demonstrates that the project may have significant impact on the environment, ordering the preparation of an EIS is appropriate. *Ctr. for Biological Diversity*, 538 F.3d at 1179. An EA is arbitrary and capricious if it fails to consider an important aspect of the problem, or "offer[s] an explanation that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Sierra Club v. United States Envtl. Prot. Agency*, 346 F.3d 955, 961 (9th Cir. 2003). Yet, "[w]hen specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive." *Bear Lake Watch, Inc. v. Fed. Energy Regulatory Comm'n*, 324 F.3d 1071, 1076–77 (9th Cir. 2003).

In urging that the EA itself was inadequate, plaintiff contends that the proposed CRT project may have significant environmental impacts on noise, traffic, GHG emissions, may establish a precedent for future actions, and may have a significant effect on the environment based on its proposed location in a highly controversial and uncertain geologically unstable area. These are addressed in turn.

### A.   Noise.

Plaintiff challenges DOE's finding of no significant impact with regard to noise on the basis that the University's previous conclusion that the CRT project's construction noise would be significant and unavoidable raises substantial questions that the project may have a significant environmental impact; plaintiff also argues that defendants used an improper method for measuring the significance of noise impacts (Pl. Br. 5–6).

*First*, plaintiff states that the final CEQA EIR prepared by the University for the CRT project and the LRDP project both concluded that the noise impact related to the CRT project and LRDP construction, respectively, would have a "significant and unavoidable impact" on the

environment (AR 7955, 11125).  Plaintiff asserts that the EA relied mostly on these same noise measurements taken by the University's consultant (AR 96).  Thus, plaintiff argues, these prior conclusions raise a substantial question that the CRT project may have a significant noise impact on the surrounding environment (Pl. Br. 5).

Defendants were not required to rely on the conclusion in the CEQA EIR because CEQA and NEPA are different statutes with different requirements.  Indeed, one whole point of the plaintiff's previous successful lawsuit was to force the federal agency to do its own NEPA review separate from CEQA review.  The noise data cited in the EIR prepared by the University for the CRT project were based on "generic construction noise data typically used in an environmental impact report when detailed phase-by-phase information is not available for the numbers and types of pieces of equipment expected at the construction site" (AR 5192).  DOE relied on a refined and more recent construction noise analysis for the CRT project.  Its conclusion to rely on a recent and refined data analysis cannot be said to have been arbitrary and capricious.

*Second*, plaintiff contends that the EA arbitrarily concluded that there will not be significant noise impacts at the Nyingma Institute, a sensitive receptor.  As a preliminary matter, it is worth explaining the geography at issue.  The west side of the Institute property borders Highland Place and the south side of the property borders Hearst Avenue and Cyclotron Road. The eastern side of the property borders LBNL and directly overlooks the proposed site of the CRT facility, with some portion of the southern side also oriented toward the proposed construction site.  There is a meditation garden on the east side of the property (AR 8803).

Plaintiff states that the proper method of measuring the significance of noise impacts would have been to compare the current ambient noise level at selected portions of the Institute — namely, the north side of the Institute — to measurements of the maximum noise level predicted during construction.  Plaintiff further argues that DOE's analysis of noise "make[s] it appear that the Institute's users — even people using the meditation garden . . . currently hear all of the traffic noise on Hearst Avenue as if they were sitting on the curb of that street."  Plaintiff also accuses DOE of trying to "downplay the importance of the City of Berkeley's noise limit,"

given that its noise calculations were in excess of what is permitted by the ordinance" (Pl. Br. 7–8).

Defendants respond that they properly used the City of Berkeley's noise ordinance as a benchmark to measure significance. Indeed, agencies are permitted to determine a threshold of significance for noise impacts. *Seattle Cmty. Council Fed'n v. Fed. Aviation Admin.*, 961 F.2d 829, 833 (9th Cir. 1992). The ordinance requires a comparison of the project's construction noise levels at the property line to the ordinance's threshold. *See* BERKELEY, CAL., MUN. CODE § 13.40.070.B.7.a–b. The threshold set by the City of Berkeley's noise ordinance for the Institute, a R-3 zoned property, was 65 dBA. BERKELEY MUN. CODE § 13.40.070.B.7.b (Table 13.40-4).

The refined noise analysis, conducted by an experienced acoustical expert, showed that at the worst-case scenario, the maximum construction noise would be 66 dBA, only 1 dBA above what is permitted by the City of Berkeley's noise ordinance (AR 5192–94). As defendants point out, plaintiff offers no contrary expert opinions (Def. Opp. 9). And "[c]ourts defer to the evaluations of agencies when the evidence presents conflicting views because an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive." *Pac. Coast Fed'n v. Fishermen's Ass'ns v. United States Bureau of Reclamation*, 426 F.3d 1082, 1090 (9th Cir. 2005) (internal quotations and citations omitted); *see Marsh*, 490 U.S. at 377 (stating that when deciding issues that "require[] a high level of technical expertise, [courts] must defer to the informed discretion of the responsible federal agenc[y]").

The record shows that the refined construction noise analysis was based on "[i]nformation on the numbers and types of equipment expected at the construction site during each phase . . . supplied by LBNL, as well as the number of days that the equipment would be present on the construction site" (AR 5192). The refined analysis assumed equipment would be operating for an "entire 8-hour day" and generated the noise levels associated with construction equipment based on the Federal Highway Administration Construction Noise Model's up-to-date database of such noise levels (*ibid.*). Noise levels were calculated at two sensitive receptors, the Foothill Student Housing Complex and the Nyingma Institute. Only the calculations for the Institute are at issue

United States District Court

For the Northern District of California

1    here.  Noise levels were analyzed using the "slant distance from the CRT site to the noise-receiver

2    locations rather than the simple horizon distance" (Def. Opp. 10; AR 5192–93).  No acoustical

3    shielding was assumed for the Nyingma Institute because the "shielding analysis indicated that

4    there would be a direct line-of-sight between the Institute and the CRT construction site" (*ibid.*).

5            The refined noise analysis showed that the theoretical maximum construction noise level

6    received at the Institute would not exceed 66 dBA, under the worst-case scenario.  The

7    Department of Transportation has concluded that humans are able to detect noise level changes of

8    2–3 dBA (AR 15501–02; *see* AR 9039) ("It should be noted that a noise increase of 3 dBA is

9    generally regarded as the minimum perceptible increase").  Thus, DOE found that a difference of

10   1 dBA would not be perceptible.  As such, DOE concluded that the possibility of the construction

11   exceeding the ordinance by 1 dBA, if the worst-case scenario occurred, would not result in a

12   significant impact on the environment (AR 10).

13           In further support of its finding of no significant impact was the fact that maximum noise

14   levels during construction would still fall within the range of existing ambient noise levels at the

15   Institute (AR 96, 149).  On the north side, existing noise levels were measured and found to range

16   from 46 dBA to 57 dBA.  Measurements taken along Hearst Avenue at Highland Place, showed

17   existing noise levels ranged between 55 dBA and 80 dBA (AR 96).  The maximum projected

18   worst-case scenario construction noise level would only reach 66 dBA.

19           As for whether the 66 dBA noise levels would (or would not) be for only brief periods of

20   time (Pl. Opp. 13), the EA explained that a noise level of 66 dBA would occur only sporadically

21   over 4.5 months and, even then, only in the rare instances when all of the equipment on the

22   construction site was in simultaneous operation (AR 150–51).

23           The EA acknowledged and distinguished between existing lower noise levels on the north

24   side of the Institute, facing away from the proposed construction site, and existing higher noise

25   levels along Hearst Avenue at Highland Place near the Institute and oriented toward the proposed

26   construction site (AR 95–96).  Defendants used the City of Berkeley's ordinance as a benchmark

27   to measure significant impact — as they were entitled to do.  The record reflects a reasonably

28   thorough noise analysis.  Based on this analysis, DOE's finding of no significant impact was not

United States District Court

For the Northern District of California

arbitrary and capricious, nor does it raise a substantial question that the CRT project may have a significant noise impact on the environment.

### B.    Traffic.

Plaintiff makes two main arguments in support of its contention that the EA's traffic analysis was arbitrary and that the CRT project may have a significant impact, necessitating an EIS. Plaintiff argues first that DOE's cumulative-impact analysis is flawed, and second that DOE erred in its traffic analysis by distorting the baseline against which significance was measured. Each argument is addressed in turn.

### 1.    Cumulative Impacts.

Plaintiff argues that the EA did not properly consider cumulative effects of the CRT project because the agency used an incremental approach rather than addressing the cumulative impacts of the CRT project combined with other expected projects. Defendants respond that their analysis was consistent with what is required by the plain language of the federal Council on Environmental Quality ("CEQ") regulations.

The applicable federal CEQ regulation requires the agency to consider the cumulative effects of environmental impacts of any proposed action. 40 C.F.R. 1508.8. It defines cumulative impacts as "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions." 40 C.F.R. 1508.7. CEQ has interpreted its regulation to mean that (AR 14810):

> [C]umulative effects must be evaluated along with the direct effects and indirect effects (those that occur later in time or farther removed in distance) of each alternative. The range of alternatives considered must include the no-action alternative as a baseline against which to evaluate cumulative effects. The range of actions that must be considered includes not only the project proposal but all connected and similar actions that could contribute to cumulative effects.

DOE measured the project's incremental contribution to cumulative impacts by (Def. Opp. 14; AR 158):

> comparing the estimated 2018 traffic conditions with-Project-conditions to the estimated 2018 traffic conditions without-Project-conditions. The 2018-without-Project conditions are the traffic conditions that would exist if the

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

> Project is not implemented.  The incremental impact or the
> contribution of the Project is the change that would result if
> Project traffic is added to the 2018-without-Project-
> conditions.

To achieve an accurate traffic assessment, DOE did not rely on the University's previous EIR, which was based on 2006 LRDP projections to conduct the cumulative-impact analysis. Instead, DOE's analysis factored in recently completed, ongoing, planned, pending and/or reasonably foreseeable proposed actions in the surrounding area and in the same general time frame after the CRT project, from 2010 through 2018 (AR 156, 173).  Agencies are permitted to do this and DOE's decision to do so here was reasonable.  *See Pac. Coast Fed'n of Fishermen's Ass'ns*, 426 F.3d at 1090; *Grand Canyon Trust v. Fed. Aviation Admin.*, 290 F.3d 339, 342 (D.C. Cir. 2002).  The EA then made clear that in developing a list of future projects, it included only those projects that had reached approval or where funding was otherwise anticipated.  The EA listed each such project and included information regarding the net impact the projects would have on traffic (AR 156–57, 173–75).  It also identified other LBNL projects that would not add any new population to the LBNL site and therefore generate no new traffic (*ibid*.).  Based on the time line for completion of the other projects, the horizon year of 2018 was used for a determination of cumulative impacts (AR 173).

Courts give plain effect to the language of the regulations when evaluating whether an agency acted arbitrarily and capriciously in finding no significant environmental impact.  *Grand Canyon Trust*, 290 F.3d at 342.  Defendants conducted precisely the analysis required by the plain language of the statute.  DOE compared all reasonably foreseeable traffic levels in 2018 without the project against all reasonably foreseeable traffic levels in 2018 with the CRT project (AR 158).  Plaintiff misconstrues the plain meaning of the regulation in arguing that it requires DOE to "add[] up the impacts of *all* such future projects and compare those impacts to the baseline" (Pl. Opp. 14–15) (emphasis added).

Our court of appeals has stated that in a "cumulative impact analysis, an agency must take a hard look at all actions.  An EA's analysis of cumulative impacts must give a sufficiently detailed catalogue of past, present, and future projects, and provide adequate analysis about how these projects . . . are thought to have impacted the environment."  *Te-Moak Tribe of W. Shoshone*

United States District Court

For the Northern District of California

*of Nevada v. United States Dep't of Interior*, 608 F.3d 592, 603 (9th Cir. 2010) (internal quotations omitted); *see Grand Canyon Trust*, 290 F.3d at 342 (noting it "makes sense to consider the incremental impact of a project for possible cumulative effects by incorporating the effects of other projects into the background data base of the project at issue"). As part of an agency's cumulative-impacts analysis, it must assess "reasonably foreseeable future actions." *Grand Canyon Trust*; 290 F.3d at 341; *Barnes v. United States v. Dep't of Transp.*, 655 F.3d 1124, 1141 (9th Cir. 2011).

DOE identified four study intersections and calculated the cumulative-impact analysis described above. Plaintiff does not challenge the use of the four study intersections. DOE then applied the City of Berkeley's significance criteria, which identifies when a project is considered to cause a significant impact at signalized and all-way stops intersections. Plaintiff does not challenge the use of this threshold of significance. The analysis revealed that by 2018, three of the four studied intersections would operate poorly (AR 156–58). But, still, the results of the analysis showed that the traffic associated with the CRT project would not cause an exceedance of the significance thresholds for traffic impacts established by the City of Berkeley (AR 158).

Plaintiff states that courts have rejected the incremental approach. In support of this argument, plaintiff first directs the Court to 40 C.F.R. 1508.27(b)(7), which requires agencies to consider whether the impacts of other related projects are themselves cumulatively significant. Section 1508.27(b)(7), however, is relevant only when the project at issue is "related to other actions with individually insignificant but cumulatively significant impacts." The CRT project is a stand-alone project. *See Native Ecosystems Council*, 304 F.3d at 894 ("Where each of two projects would have taken place with or without the other, each has independent utility and the two are not considered connected actions") (internal quotations omitted). Indeed, the University has stated that the LBNL LRDP is "not an implementation plan" but rather a planning document that guides the physical development of the LBNL and that "adoption of the LRDP does not constitute a commitment to, or final decision to implement, any specific project, construction schedule, or funding priority" (AR 10740, 11075). There is no basis in the record to support a conclusion that the CRT project is designed to spur the full implementation of the LRDP. Thus,

17

United States District Court

For the Northern District of California

1    there is no inextricable nexus between the CRT project and other LRDP projects, requiring DOE

2    to consider them as related actions.  Plaintiff's argument that DOE was required to conduct

3    cumulative-impact analysis of related actions is misplaced.  As such, *Kleppe v. Sierra Club*, and

4    similar cases relied on by plaintiff that address situations where there are related actions are not

5    instructive here.  427 U.S. 390 (1976).

                              **2.      Baseline.**

7         Plaintiff also argues that DOE erred by including 2002 traffic numbers, which were higher

8    than 2006–08 traffic numbers, in the baseline. Because these numbers were more conservative

9    than the 2006–08 traffic numbers, plaintiff argues that the baseline was distorted and the resulting

10   environmental analysis has no value and is arbitrary.  *See Am. Rivers v. Fed. Energy Regulatory*

11   *Comm'n*, 201 F.3d 1186, 1195 n.15 (9th Cir. 1999) (stating "without establishing . . . baseline

12   conditions . . . there is simply no way to determine what effect [an action] will have on the

13   environment and, consequently, no way to comply with NEPA").

14        Defendants respond that their use of the 2002 traffic numbers yielded a conservative

15   estimate of traffic impacts, which reflected a worst-case scenario, and would better allow the

16   agency to determine the potential for significant environmental impacts.  The City of Berkeley

17   calculates level of service at traffic intersections based on the total volume of traffic utilizing an

18   intersection.  Impacts are measured on a change in the delay resulting from usage (AR 158).  The

19   more cars that pass through an intersection, the greater delay experienced.  Thus, defendants state

20   the "use of the 2002 data shows *more* congestion at the study intersections, and as a result, is

21   *more likely* to identify potential impacts."  Using the higher traffic count, even if older, "is

22   considered more conservative because it is more likely to result in an intersection operating at a

23   deficient level."  This would therefore mean there would be a higher likelihood of identifying a

24   significant impact (Def. Opp. 15).

25        This order finds that the agency did not act arbitrarily and capriciously in using the 2002

26   data and must defer to the agency's determination as to the appropriate baseline, especially

27   where, as here, the agency's decision to use the 2002 data was based on its attempt to determine

28   the worst-case scenario and enable it to best be able to determine the potential significant

1  environmental impacts. *See Pac. Coast Fed'n of Fishermen's Ass'ns*, 426 F.3d at 1090 (stating

2  "[e]ven when an agency explains its decision with less than ideal clarity, a reviewing court will

3  not upset the decision on that account if the agency's path may reasonably be discerned")

4  (internal quotations omitted).

5        Plaintiff also challenges DOE's traffic calculations because DOE added traffic numbers to

6  the 2002 data rather than using the most current data. DOE has offered a reasonable explanation

7  for its use of the 2002 traffic data, which it used to its own disadvantage to show the worst-case

8  scenario for the CRT project's environmental impact. DOE used the 2002 traffic data as a

9  baseline and added in traffic from projects that were constructed and became operational since

10  that time, to reflect existing conditions (AR 99, 2466). The Maxwell Field Family parking

11  structure project was one project included in the analysis as a near-term project because at the

12  time, it was a reasonably foreseeable project (Def. Opp. 16). Plaintiff contends because the

13  project was later put on hold, DOE's inclusion of this near-term project caused it to overstate and

14  misrepresent traffic counts (Pl. Br. 13). But DOE's decision to include traffic impacts from the

15  Maxwell Field Family parking structure cannot be said to have been unreasonable because the

16  project was not put on hold until after the issuance of the draft EA and only a few months prior to

17  the issuance of the final EA.

18        Finally, plaintiff contends that the EA did not mention existing traffic conditions. This

19  was not so. Existing traffic conditions were analyzed and compared to the estimated traffic

20  generated by near-term projects, and this was compared to the estimated traffic conditions with

21  the traffic impacts of the near-term projects and the traffic impacts of the CRT project (AR

22  157–62).

23        The record shows that DOE took a hard look at the cumulative traffic impact. It also

24  analyzed the traffic impacts of five alternatives, which included a no-action alternative. The

25  Court is satisfied that DOE's analysis does not raise a substantial issue as to whether the proposed

26  CRT project's impact on traffic may have a significant impact on the environment. This order

27  finds that, as to the traffic issue, the finding of no significant impact was not arbitrary and

28  capricious.

United States District Court

For the Northern District of California

C.      GHG Emissions.

Plaintiff contends that the CRT project may significantly impact the environment on account of the GHG emissions that will result.

*First*, plaintiff contends that DOE failed to take a hard look at the CRT project's GHG emissions. Specifically, plaintiff accuses defendant of fashioning a threshold from the federal Council on Environmental Quality's ("CEQ") draft guidance document and not addressing *indirect* GHG emissions, which are off-site emissions such as those that may be generated by vehicle trips to and from the project. Plaintiff cites to *Sierra Club v. United States Department of Transportation*, for the proposition that an environmental analysis is arbitrary where it attempts to fashion a significance threshold from a guidance or regulation that disavows such an intent. 1990 U.S. Dist. LEXIS 7811, *13–14 (N.D. Cal. Apr. 2, 1990). But that ruling granted relief because the agency had failed to indicate the source of its standard.

Here, however, DOE provided full disclosure in the EA that it relied on federal CEQ guidance to evaluate GHG emissions and the project's impact on the environment. The EA clearly stated that the "appropriate approach to evaluating a project's potential impact on global climate under NEPA is still under development" and that the "Council on Environmental Quality, the agency responsible for administering NEPA, has released [only] draft guidance" (AR 141).

Furthermore, the EA stated that CEQ guidance recommends a threshold of 25,000 metric tons of CO2-equivalent ("MTCO2e") of *direct* GHG emissions per year as "a threshold for analysis within NEPA documents" (AR 141, 5199). Indeed, CEQ draft guidance states that it "does not propose [25,000 MTCO2e per year] as an indicator of a threshold of significant effects, but rather as an indicator of a minimum level of GHG emissions that may warrant some description in the appropriate NEPA analysis for agency actions involving direct emissions of GHGs" (AR 5200). Based on this guidance, the EA stated that it considered GHG emissions of 25,000 MTCO2e per year to be a "dividing line for major GHG emitters, which could have the potential to result in an adverse impact on the environment" (AR 142).

DOE analyzed GHG emissions and concluded that *direct* GHG emissions would be 635 MTCO2e per year, which is far below the 25,000 MTCO2e threshold for analysis set forth by

CEQ.  DOE also analyzed *direct and indirect* GHG emissions and concluded that the net direct and indirect emissions would total 12,473 MTCO2e per year, which is fifty percent below the 25,000 MTCO2e per year threshold (AR 143–44).  Pursuant to CEQ draft guidance, a proposed action with *direct* GHG emissions under 25,000 MTCO2e per year would not "warrant some description of appropriate NEPA analysis" (AR 5200).

The above-stated analysis, however, did not constitute the sole basis for the agency's determination that the project's GHG emissions would not significantly impact the environment. DOE also considered GHG emissions that would result under five alternative plans, including a no-action plan.  And, DOE considered the fact that numerous of the project's design features would minimize its GHG emissions.  The EA discussed the following project design features, which were intended to minimize the project's GHG emissions:  (1) designing the project to meet the LEED gold standards for green building design; (2) replacing recycling and waste management practices as well as utilizing clean energy sources; (3) having electricity consumption that will be more than 30 times better than the state's energy efficiency standards for residential and nonresidential buildings; and (4) implementing power usage efficiency for the high performance computer that is better than any data center benchmarked to date (AR 144–45, 349).

The EA took a hard look at *direct and indirect* GHG emissions and adequately analyzed the impacts of the project's GHG emissions and made a reasonable determination that the GHG emissions would not significantly impact the environment.

*Second*, plaintiff argues that the Bay Area Air Quality Management District's ("BAAQMD") newly established threshold of significance of 1,100 MTCO2e per year raises a substantial question that the CRT project's GHG emissions may be significant.  BAAQMD, a state-created entity, developed its new threshold of significance with an eye toward meeting the goals set forth in California Assembly Bill 32.  AB 32, signed into law in 2006, requires that California cap its GHG emissions at 1990 levels by 2020.  Exceeding the BAAQMD threshold requires that the lead agency responsible for a project implement all feasible mitigation measures and associated emission reductions (AR 4785).

To establish its threshold of significance, BAAQMD assessed the 2001–08, CEQA "database to determine the frequency distribution trend of project sizes and types that have been subject to CEQA over the past several years" (AR 4860). (The CRT project underwent the CEQA process in 2007–08.) It then estimated GHG emissions for new development projects to determine the amount of GHG emissions that could be reduced through application of mitigation measures to "future land use development projects subject to CEQA" in order to meet the goal set forth in AB 32 (*ibid*.) (estimating 4,000 new development projects from 2010–20). Then, BAAQMD conducted a "sensitivity analysis" to determine the threshold that would need to apply to new projects in order to meet the AB 32 goal. From this analysis, BAAQMD established a "gap-based" threshold standard of 1,100 MTCO2e per year, which would be applied to projects undergoing state CEQA review from 2010 through 2020 (AR 4858–66).

DOE did not conduct a BAAQMD analysis because, among other reasons, the BAAQMD recommended threshold was not issued until after DOE conducted its GHG analysis. Plaintiff concedes, moreover, that the BAAQMD threshold was not binding on DOE. Indeed, the BAAQMD guidance indicates that the BAAQMD threshold would apply to "new projects between now and 2020" (Pl. Br. 19; AR 4873). (The BAAQMD guidelines issued in June 2010.)

The short answer is that BAAQMD is a creature of the state. CEQ, a federal entity, has provided the critical guidance on the issue of GHG emissions. CEQ guidance governs federal NEPA actions, like this action here. The whole point of plaintiff's first lawsuit was to require an analysis under NEPA, the federal law, after abandoning its state CEQA lawsuit. Plaintiff cannot now have it both ways and shoehorn state law under NEPA. Here, the federal agency looked to federal guidance to conduct its analysis. That was sufficient.

*Third*, plaintiff contends that the EA arbitrarily calculated GHG emissions by making an improper assumption that Western Area Power Administration ("WAPA") uses more non-GHG-emitting power than Pacific Gas and Electric. The EA indicated that one benefit to constructing the CRT facility at LBNL would be that it would then derive power from WAPA, which would provide it with a source of pure hydropower (AR 143–48; 449; 490). DOE compared GHG emissions resulting from WAPA and PG&E power. DOE relied on its expert's analysis in

1    determining the mix of power sources in WAPA and PG&E power.  Based on the expert's

2    comparison of power mixes, DOE concluded that WAPA would deliver cleaner power than

3    PG&E because WAPA would be able to provide twenty percent of its power mix from pure

4    hydropower from the Bureau of Reclamation's Central Valley project supply (AR 449–52).  This

5    is indicated in the EA (AR 144).

6          The draft and final EA and the record identified the data sources used to make calculations

7    to support DOE's conclusion that WAPA would provide a cleaner power supply than PG&E (AR

8    143–44, 147, 222, 449–52, 662–702).  The EA also described the methodology the agency

9    employed to reach its GHG emissions conclusions (AR 141–45; *see* AR 222, 449–52).  DOE's

10   calculation of power mixture was reasonable and not arbitrary and capricious.  No substantial

11   question is raised that GHG emissions may have a significant impact on the environment.  The

12   order further concludes that the finding of no significant impact, as to the GHG issue, was not

13   arbitrary and capricious.

14                    **D.    Precedential Impact.**

15         Plaintiff argues that the CRT project is significant because it sets a precedent for

16   construction of other projects.  Plaintiff states that the "CRT Project is designed to implement the

17   [LBNL LRDP]" and that by "approving construction of the CRT Project at LBNL, DOE makes it

18   much more likely that the agency and LBNL will continue to build projects on the crowded, and

19   dangerous hill campus."  By approving the CRT project, DOE sets a precedent for implementing

20   the LRDP, it is argued.  Therefore, plaintiff argues, DOE must prepare an EIS for the CRT project

21   and address the "future actions it is linked to in the LBNL LRDP" (Pl. Br. 13–14).  On reply,

22   plaintiff contends that 40 CFR 1508.27(b)(6)–(7) requires agencies to consider whether a "project

23   may establish a precedent for future actions with significant effects" and is "related to other

24   actions with individually insignificant but cumulatively significant impacts."

25         The record shows that the LRDP — the University's Long Range Development Plan —

26   was a land-use plan (AR 10740, 11075).  Indeed, the state EIR for the LRDP indicated clearly

27   that "[t]he LRDP is not an implementation plan, and adoption of the LRDP does not constitute a

28   commitment to any specific project, construction schedule, or funding priority" (*ibid*.).  Our court

United States District Court
For the Northern District of California

1   of appeals has concluded that the purpose of the precedential requirement is to "avoid the

2   thoughtless setting in motion of a chain of bureaucratic commitment that will become

3   progressively harder to undo the longer it continues." *Presidio Golf Club v. Nat'l Park. Serv.*,

4   155 F.3d 1153, 1162–63 (9th Cir. 1998) (internal quotations omitted).  Here, the CRT project is a

5   stand-alone project even by the University's own conception of the project. *See Native*

6   *Ecosystems Council*, 304 F.3d at 894 ("Where each of two projects would have taken place with

7   or without the other, each has independent utility and the two are not considered connected

8   actions").

9       The record does not support a finding that the CRT project will be precedent setting.

10  There is no indication that it will set in motion or spur "commitment to any specific project" (AR

11  10740, 11075).  And there is no indication that it is related to any other projects such that another

12  would follow on by reason of the CRT project.  As such, the EA's finding of no significant

13  impact was not arbitrary and capricious on the grounds that it did not expand its review to include

14  the entirety of the LRDP.  No substantial question is raised as to this issue that the CRT Project

15  may have a significant impact on the environment.

**E.      Highly Controversial and Uncertain Geologically Unstable Area.**

17      Plaintiff contends that the CRT project may have a significant effect on the environment

18  based on its proposed location in a highly controversial and uncertain geologically unstable area.

19  For support, plaintiff relies on California Professor Emeritus Garniss Curtis, who expressed his

20  concern in a comment submitted on the draft EA for "the strength of the westward dipping shale

21  rocks which the building will rest on."  He also expressed a similar concern as part of public

22  comment on the University's EIR prepared for the CRT project in 2008 (AR 768, 1469).

23  Professor Curtis further raised an issue that the proposed CRT project site was near a collapsed

24  caldera (AR 1463).

25      Defendants respond that the CRT project site is neither highly controversial nor

26  geologically unstable.  In considering whether an action will have a significant impact, an agency

27  should consider the "degree to which the effects on the quality of the human environment are

28  likely to be highly controversial," "highly uncertain," or "involve unique or unknown risks."  40

United States District Court

For the Northern District of California

1   CFR 1508.27(b)(4)–(5).  The mere existence of *opposition* to a proposed action does not establish

2   that it is "highly controversial."  *See Presidio Golf Club*, 155 F.3d at 1162.  Substantial public

3   controversy exists where the proposal is "highly controversial," such as when there is a

4   "substantial dispute [about] size, nature, or effect of the major Federal action rather than the

5   existence of opposition to a use."  *Native Ecosystems Counsel v. United States Forest Serv.*, 428

6   F.3d 1233, 1240 (9th Cir. 2005).

7        DOE retained its own technical expert and an additional geologist to conduct a thorough

8   analysis of the project design and assist with its preparation of the EA.  Plaintiff contends that

9   DOE's decision to retain an expert shows that Professor Curtis raised a highly controversial issue

10  (Pl. Br. 22).  But DOE's attempt to analyze this issue does not make it a controversial issue.

11  Based on the data acquired and reviewed for the study, DOE determined that it was feasible to

12  construct the proposed CRT facility.  The study also concluded that the analysis did "not support

13  Professor Curtis' conclusion that the general strike and dip of the Cretaceous bedrock presents an

14  adverse condition." (AR 742).  The EA set forth the data used in the geological investigation of

15  the CRT project site, which included physical sampling in the form of data gathered from

16  hundreds of borings and excavations taken throughout the LBNL site (AR 330–39).  The data was

17  disclosed to the public in several forums, including in responses to comments issued on the draft

18  EA (AR 3079–84; 3819–22).  DOE addressed the concerns in public comments regarding the

19  caldera and stability issue (AR 329–39).  DOE did not ignore Professor Curtis' concerns, as

20  plaintiff suggests.

21       DOE's geological analysis of the CRT project site, which was based on actual scientific

22  exploration, concluded that there was no evidence to support Professor Curtis' *theory* and that

23  there was not a substantial dispute as to the geology and slope stability of the CRT project site

24  (AR 73–79, 330–31, 742).  The EA stated that the "theory that volcanic rocks at LBNL originated

25  in an alleged caldera collapse alluded to by some commenters is not borne out in the geological

26  observations of the LBNL site" (AR 330).

27       The Court finds no basis to support plaintiff's contention that the construction of the

28  proposed CRT facility is highly controversial or located in a geologically unstable area.  The

1  evidence in the EA and the record does not bear out this point and DOE has stated that Professor

2  Curtis' theory is not known to be supported by any other expert, and, importantly, the actual

3  scientific analysis does not support such a theory.  As to plaintiff's argument here, the Court does

4  not find that there is a substantial question raised as to whether the CRT project may have a

5  significant impact.  DOE's finding of no significant impact with regard to this issue was not

6  arbitrary and capricious.

7  **3.  CLAIM FOR FAILURE TO PREPARE AN EIS (NEPA AND APA).**

8  Plaintiff claims DOE violated NEPA and the APA because it failed to prepare an EIS for

9  the CRT project and failed to adequately evaluate the impacts in the EA.  The first claim turns on

10  the second.  As discussed in great detail above, no substantial questions are raised as to whether

11  the CRT project may have a significant environmental impact.  Thus, an EIS will not be required.

12  As stated, NEPA is a "purely procedural statute."  It "does not mandate particular *results*,

13  but simply provides the necessary process to ensure that federal agencies take a hard look at the

14  environmental consequences of their actions."  *Neighbors of Cuddy Mountain v. Alexander*, 303

15  F.3d 1059, 1070 (9th Cir. 2002) (emphasis added).  NEPA requires preparation of an EIS for

16  "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C.

17  4332(2)(C).  An agency first prepares an EA to determine whether an action will have a

18  significant impact, thus requiring preparation of an EIS.  40 C.F.R. 1508.9.  "An EIS must be

19  prepared if substantial questions are raised as to whether a project . . . may cause significant

20  degradation of some human environmental factor."  *Ocean Advocates*, 402 F.3d at 864–65

21  (stating that to trigger an EIS, a "plaintiff need not show that significant effects *will in fact occur*

22  but raising substantial questions whether a project may have a significant effect is sufficient")

23  (internal quotations omitted).  If the agency concludes there is no significant effect associated

24  with the proposed project, it may issue a FONSI in lieu of preparing an EIS.  *Envtl. Prot. Info.*

25  *Ctr. v. United States Forest Serv.*, 451 F.3d 1005, 1009 (9th Cir. 2006); 40 C.F.R. 1508.9(a)(1).

26  The Court concludes based on review of the administrative record and the foregoing

27  analysis that there are no substantial questions raised as to whether the project may have a

28  significant environmental impact.  DOE's finding of no significant impact and preparation of an

United States District Court

For the Northern District of California

26

United States District Court

For the Northern District of California

1    EA was not arbitrary and capricious and an EIS is not required.  Thus, defendants' motion for

2    summary judgment is **GRANTED**.  Plaintiff's motion for summary judgment is **DENIED**.

3            **4.       MOTION TO STRIKE.**

4            Defendants move to strike plaintiff's opposition to defendants' motion for summary

5    judgment and reply in support of plaintiff's motion for summary judgment.  Defendants contend

6    that plaintiff's opposition exceeded the number of pages permitted for the reply brief.  The motion

7    to strike is **DENIED AS MOOT**.

8            **5.       MOTION TO AUGMENT THE RECORD AND REQUESTS FOR JUDICIAL NOTICE.**

9            Plaintiff filed a motion to augment the record and three requests for judicial notice.

10   Plaintiff moves to augment the record to include information that demonstrates that DOE

11   allegedly did not consider relevant factors in its GHG analysis in the EA.

12           Judicial review of an agency's decision is based on the "administrative record already in

13   existence, not some new record made initially in the reviewing court."  *Camp*, 411 U.S. at 142.

14   There are four exceptions to this rule:  (1) "if necessary to determine whether the agency has

15   considered all relevant factors and has explained its decision;" (2) "when the agency has relied on

16   documents not in the record;" (3) "when supplementing the record is necessary to explain

17   technical terms or complex subject matter;" or (4) "when plaintiffs make a showing of agency bad

18   faith."  *Ctr. for Biological Diversity v. United States Fish and Wildlife Serv.*, 450 F.3d 930, 943

19   (9th Cir. 2006).  However, our court of appeals has made clear that where a plaintiff had

20   opportunity to submit the extra-record testimony they seek to admit before the reviewing court, it

21   should not be accepted by the court.  *See Havasupia Tribe v. Robertson*, 943 F.2d 32, 34 (9th Cir.

22   1991) (stating "[a]bsent exceptional circumstances, such belatedly raised issues may not form a

23   basis for reversal of an agency decision").

24           The documents plaintiff seeks to add to the administrative record were available to

25   plaintiff during the time of the agency proceedings.  Plaintiff makes no showing of exceptional

26   circumstances for failing to submit the documents during the agency proceedings.  Moreover, as

27   explained in detail above, the Court is satisfied that the record shows that DOE's analysis

28

27

**United States District Court**
For the Northern District of California

1   considered the factors relevant to its determination of GHG emissions that will result from the

2   CRT project.  Plaintiff's motion to augment the record is **DENIED**.

3       Plaintiff's reply in support of the motion to augment the record requests the Court to strike

4   the declaration of Eric Bell, appended to defendants' opposition to plaintiff's motion to augment

5   the administrative record.  This request is not made on proper motion and will not be considered

6   as a motion to strike.

7       Plaintiff makes three requests for judicial notice (Dkt. Nos. 38, 40, 51).  Plaintiff's

8   requests for judicial notice are, to the extent stated below, **GRANTED**.  Judicial notice is taken of

9   the following documents:  (1) Order Granting in Part Petition for Writ of Mandate and

10  Mandamus, *Stand Up for Berkeley, Council of Neighborhood Associations v. Regents of the*

11  *University of California*, Case No. RG10499854 (Nov. 9, 2009), Superior Court of the State of

12  California for the County of Alameda (Dkt. No. 34-1); (2) Bay Area Air Quality Management

13  District, "California Environmental Quality Act Guidelines Update — Proposed Thresholds of

14  Significance" (December 7, 2009) (Dkt No. 34-5); (3) Excerpt of the official minutes of the

15  Regents of the University of California for July 19, 2007 including Agenda Item 7(a) and the

16  regents' approval (Dkt. No 51 at Exh A); (4) Letter from Kim Abbott, NEPA Document Manager,

17  Department of Energy, Berkeley Site Office, Lawrence Berkeley National Laboratory, to Michael

18  R. Lozeau, Lozeau Drury LLP, dated March 10, 2011 (Dkt. No. 51 at Exh. B).

**CONCLUSION**

20      For the foregoing reasons, defendants' motion for summary judgment is **GRANTED**.

21  Plaintiff's motion for summary judgment is **DENIED**.  Plaintiff's motion to augment the record is

22  **DENIED**.  Plaintiff's requests for judicial notice are **GRANTED**, to the extent stated above.

23  Defendants' motion to strike is **DENIED AS MOOT**.

25      **IT IS SO ORDERED.**

27  Dated:  November 14, 2011.

_____
WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE